## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORRIS AKERMAN, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WEBMD HEALTH CORP., MARTIN J. WYGOD, STEVEN L. ZATZ, MARK J. ADLER, IAN G. BANWELL, NEIL F. DIMICK, JAMES V. MANNING, WILLIAM J. MARINO, JOSEPH E. SMITH, STANLEY S. TROTMAN, JR., KRISTIINA VUORI, MH SUB I, LLC, and DIAGNOSIS MERGER SUB, INC.,<br><br>Defendants. | Case No.: _____<br><br><u>CLASS ACTION</u><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY DEMANDED**</u> |

Plaintiff Morris Akerman ("Plaintiff"), individually on behalf of himself and all others similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to his own acts and information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WebMD Health Corp. ("WebMD" or the "Company"), advisories about the Company and its proposed acquisition, as described below.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action brought pursuant to Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9,

17 C.F.R. §240.14d- 9(d) ("Rule 14d-9"), to enjoin the expiration of a tender offer (the "Offer") which, if completed, will result in Kohlberg Kravis Roberts & Co. L.P., through its affiliate Internet Brands, and Internet Brands' affiliates MH Sub I, LLC ("Parent") and Diagnosis Merger Sub, Inc. ("Purchaser," collectively with Kohlberg Kravis Roberts & Co. L.P., Internet Brands and Parent, "KKR") acquiring WebMD (the "Proposed Transaction").

2.      On July 24, 2017, WebMD and KKR issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell WebMD to KKR. Under the terms of the Merger Agreement, KKR will acquire all outstanding shares of WebMD for $66.50 in cash per share of WebMD's common stock (the "Offer Price"). Pursuant to the Merger Agreement, KKR, through Parent and Purchaser, commenced the Offer on August 7, 2017. The Offer is scheduled to expire at 11:59 p.m., New York City time on September 7, 2017. The Proposed Transaction is valued at approximately $2.8 billion.

3.      On August 7, 2017, WebMD filed, with the SEC, a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") which recommends that WebMD stockholders tender their shares in favor of the Proposed Transaction. The Recommendation Statement omits or misrepresents material information regarding, among other things: (a) the Company's financial projections, relied upon by WebMD's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") in connection with rendering its fairness opinion; (b) J.P. Morgan's potential conflicts of interest; (c) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; (d) the background process leading up to the Proposed Transaction; and (e) WebMD insiders' potential conflicts of interest. The failure to adequately disclose such material information constitutes a violation of the Exchange Act.

4.      The Proposed Transaction proposes to unlawfully divest WebMD's public stockholders of valuable Company assets without fully disclosing all material information to them.  As a result, WebMD stockholders are unable to make a fully informed decision whether to tender their shares in support of the Proposed Transaction or seek appraisal, in violation of the Exchange Act.  To remedy Defendants' violations, Plaintiff seeks to enjoin the expiration of the Offer unless and until such problems are remedied.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this Action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §§1331.

6.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and this is the District in which the Company maintains its principal place of business.  In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce.  Moreover, WebMD is headquartered in this District.

## PARTIES

7.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of WebMD.

8.      Defendant WebMD is an online publisher of health information and medical news.  It maintains its publicly available information at www.webmd.com.  The Company is incorporated in Delaware with principal executive offices at 395 Hudson Street, New York, New York 10014. Its common stock is traded on the Nasdaq Stock Market LLC (the "Nasdaq") under the ticker symbol "WBMD."

9.      Defendant Martin J. Wygod ("Wygod") is and has been Chairman of the Board since May 2005. He also served as Chairman of the Company's former parent company HLTH Corporation's ("HLTH") board of directors from March 2001 until completion its reverse merger with WebMD in October 2009.

10.      Defendant Steven L. Zatz ("Zatz") is and has been Chief Executive Officer ("CEO") of the Company since September 2016.  He is and has also been a member of the Company's Board of Directors (the "Board") since November 2016.  He has been with the Company and/or one of its predecessors for 17 years.

11.      Defendant Mark J. Adler ("Adler") is and has been a member of the Board since September 2005. He also served as a member of HLTH's board of directors from September 2000 until completion of the reverse merger with WebMD in October 2009.

12.      Defendant Ian G. Banwell ("Banwell") is and has been a member of the Board since January 2017.

13.      Defendant Neil F. Dimick ("Dimick") is and has been a director of the Company since September 2005. He also served as a member of HLTH's board of directors from September 2000 until completion of the reverse merger with WebMD in October 2009.

14.      Defendant James V. Manning ("Manning") is and has been a member of the Board since September 2005. He also served as a member of HLTH's board of directors from September 2000 until completion of the reverse merger with WebMD in October 2009.

15.      Defendant William J. Marino ("Marino") is and has been a member of the Board since April 2014.

16.     Defendant Joseph E. Smith ("Smith") is and has been member of the Board since October 2009.  He also served as a member of HLTH's board of directors from September 2000 until completion of the reverse merger with WebMD in October 2009.

17.     Defendant Stanley S. Trotman, Jr. ("Trotman") is and has been a member of the Board since September 2005.

18.     Defendant Kristiina Vuori ("Vuori") is and has been a member of the Board since July 2014.

19.     Defendants Wygod, Zatz, Adler, Banwell, Dimick, Manning, Marino, Smith, Trotman, and Vuori are collectively referred to herein as the "Board" or the "Individual Defendants."

20.     The Individual Defendants, with defendant WebMD, are collectively referred to herein as "Defendants."

21.     Defendant MH Sub I, LLC (referred to herein as "Parent," as noted *supra*) is a Delaware limited liability company and an affiliate of Internet Brands.

22.     Defendant Diagnosis Merger Sub, Inc. (referred to herein as "Purchaser," as noted *supra*) is a Delaware corporation and the wholly-owned subsidiary of Parent.  Its headquarters are located in Los Angeles County, California.

## RELEVANT NON-PARTIES

23.     Kohlberg Kravis Roberts & Co. L.P is a multinational private equity firm publicly traded on The New York Stock Exchange under the ticker symbol "KKR." It is headquartered in this District at 9 West 57th Street, Suite 4200, New York, NY 10019.

24.     Internet Brands is a fully integrated online media and client services organization. It was founded as CarsDirect.com in 1998, had an IPO in November 2007 on the Nasdaq, and was acquired by a private equity firm in 2010.  As a result, it was delisted from the Nasdaq.

Kohlberg Kravis Roberts & Co. L.P acquired the Company in 2014.  It is a Delaware corporation headquartered in Los Angeles County, California.

## SUBSTANTIVE ALLEGATIONS

### Background to the Proposed Transaction

25.    The Recommendation Statement outlines the background to the Proposed Transaction.  On January 27, 2017, defendant Wygod called a meeting of the Board's Executive Committee. Defendant Banwell also attended the meeting.  Among other things, the Executive Committee and Banwell discussed the fact that several private equity funds, including two private equity funds referred to in the Recommendation Statement as "Sponsor A" and "Sponsor B" had expressed interest in a potential transaction involving the Company.

26.    From February 2 to February 6, 2017, the Executive Committee, defendants Wygod and Zatz, the Company's Chief Financial Officer Blake DeSimone ("DeSimone"), along with other Company representatives and the Company's outside legal counsel, held separate meetings with representatives of three investment banks, including J.P. Morgan, to discuss "a potential strategic review process involving the Company."

27.    On February 8, 2017, the Board held a telephonic meeting to discuss "commencing a process to evaluate the Company's strategic alternatives." At this meeting, the Board received a report from senior management regarding the discussions which occurred between February 2 to February 6 with the investment banks.  Defendant Wygod also "indicated that if the Board proceeded with a process to review strategic alternatives, including a possible sale of the Company, he did not intend to participate with any potential purchasers in connection with the possible sale of the Company."

28.    On February 13, 2017, the Board held another telephonic meeting.  Among other things, "members of senior management advised the Board that J.P. Morgan was likely to have

significant relationships with a number of the potential bidders in the process. Following a discussion of the Company's situation and views regarding possible financial advisors to the Company, the Board decided to engage J.P. Morgan as the Company's financial advisor in connection with an exploration of strategic alternatives[.]"  The Company engaged J.P. Morgan on February 14, 2017.

29.    On February 15, 2017, the Board held another telephonic meeting with representatives of J.P. Morgan and the Board's outside legal counsel.  At that meeting, the Board decided to commence a process to explore the Company's strategic alternatives, and publicly announce that decision.

30.    On February 16, 2017, the Company issued two press releases.  In the first, attached as Exhibit 99.1 to a Form 8-K filed with the SEC on that same day, the Company reported its fourth quarter and full year 2016 financial results. For the quarter, revenue was $207.5 million, compared to $192.1 million in the fourth quarter of 2015. Advertising and sponsorship revenue for the quarter was $171.0 million, compared to $158.3 million in the fourth quarter of 2015. Net income increased 32% to $36.2 million, compared to $27.5 million in the fourth quarter of 2015. For the year, revenue was $705.0 million, compared to $636.4 million the year prior. Advertising and sponsorship revenue was $561.3 million for the year, or 79.6% of the Company's total revenue, compared to $499.0 million for 2015, or 78.4% of WebMD's total revenue. Net income increased 43% to $91.3 million, compared to $64.0 million in the year prior. Defendant Zatz commented on the fourth quarter and full year 2016 financial results, stating:

> Our financial outlook for this year reflects ongoing uncertainty in the healthcare landscape. While we are not satisfied with the growth we are projecting at the present time for 2017, we remain positive about the longer term opportunity and believe that, as

demand for digital health services continues to grow, WebMD and Medscape are uniquely positioned as the market leaders with strong brands, unparalleled engagement of consumer health and physician audiences, and a proven ability to demonstrate value to our customers.

31.    In the second February 16, 2017 press release, filed as Exhibit 99.1 to a Form 8-K filed with the SEC on February 17, 2017, the Company "announced that its Board of Directors, working together with its management team and legal and financial advisors, has commenced a process to explore and evaluate potential strategic alternatives focused on maximizing shareholder value. These alternatives could include, among other things, the sale of part or all of the company, a merger with another party or other strategic transaction or continuing to execute on WebMD's business plan."

32.    According to the Recommendation Statement, after that announcement, "J.P. Morgan communicated with a total of 122 strategic and financial parties to evaluate their interest in a potential transaction involving the Company. Beginning on March 21, 2017, confidentiality agreements were distributed to 48 parties, based on the level of interest that such parties had in pursuing a potential transaction[.]"

33.    "Throughout April and May 2017, 39 parties signed confidentiality agreements, including 19 strategic parties and 20 financial sponsors, including KKR." The Recommendation Statement does not disclose whether the confidentiality agreements contain "Don't-Ask, Don't-Waive" ("DADW") standstill provisions which prevent a potential acquirer from making any public or private request that a target waive the standstill restrictions.

34.    According to the Recommendation Statement, "[b]eginning on April 19, 2017, at the direction of the Board, J.P. Morgan provided bidders with a process letter, which summarized the procedures and timetable for providing a non-binding indication of interest. The process

letter established May 10, 2017 as the deadline to submit a preliminary non-binding indication of interest."

35.    The Board and senior management received an update on the strategic process from J.P. Morgan via telephone on April 28, 2017.

36.    According to the Recommendation Statement, "[o]n May 10, 2017 and May 11, 2017, the Company received preliminary non-binding indications of interest from ten parties (one strategic bidder and nine financial sponsor bidders, including KKR) with respect to an acquisition of the Company."  These proposals ranged in price from $46.50 per share to $65.00 per share. A private equity fund, "Sponsor C," indicated interest in pairing with other bidders as potential equity partners.

37.    On May 15, 2017, the Board, senior management, J.P. Morgan and the Board's outside legal counsel held a telephonic meeting to discuss the first-round proposals.  Following that discussion, the Board invited "Sponsor A" (KKR) and four other potential bidders. The specific amounts bid by each of these bidders in the first round is not provided for in the Recommendation Statement.

38.    On May 21, 2017, a strategic bidder referred to in the Recommendation Statement as "Strategic Party B," which previously indicated it was not interested in considering a potential transaction with the Company, signed a confidential agreement and received the materials provided to the other bidders in the first round.  The Recommendation Statement does not disclose whether the confidentiality agreements contain DADW standstill provisions.

39.    On May 25, 2017, a portfolio company of Sponsor A referred to in the Recommendation Statement as "Co-Bidder A" signed a confidentiality agreement with the Company, at the request of KKR.

40.    According to the Recommendation Statement, "[f]rom May 24, 2017 to July 19, 2017, representatives of the Company and J.P. Morgan had diligence meetings with, gave management presentations to and attended telephonic and in-person meetings with, various representatives of the bidders as part of the bidders' ongoing due diligence efforts."

41.    On June 2, 2017, defendant Wygod, despite previously indicating that he did not intend to participate with any potential purchasers in connection with the possible sale of the Company, met with Co-Bidder A to discuss its participation in KKR's bid.

42.    On June 7, 2017, at the direction of the Board, J.P. Morgan provided KKR, Strategic Party A, and three other bidders with second round process letters, establishing June 11, 2017, as the deadline to submit second-round proposals, June 22, 2017, as the deadline to submit lists of key issues on the transaction agreement, and July 6, 2017, as the deadline to submit proposed drafts of each bidder's financing commitments.

43.    On June 9, 2017, one of the bidders, Strategic Party B, submitted a preliminary indication of interest to acquire WebMD for $65.00 per share, subject to approval by its board of directors at a July 25, 2017 meeting.

44.    That same day, another bidder, Sponsor B, notified J.P. Morgan that it "was no longer interested in an acquisition of the Company."

45.    On June 12, 2017, a private equity fund referred to in the Recommendation Statement as "Sponsor F" "verbally proposed to defendant Wygod a revised preliminary, non-binding indication of interest to acquire the Company at $61.00 per share. The Board decided not to invite Sponsor F into the second round of the process[.]"

46.    On June 14, 2017, at the direction of the Board, J.P. Morgan distributed a draft merger agreement to KKR, and three other potential bidders.  On that same day, a fifth bidder,

Sponsor E, informed J.P. Morgan "that it was no longer interested in pursuing an acquisition of the Company."

47.     On June 27, 2017, Sponsor D contacted J.P. Morgan and informed it that Sponsor D t was no longer interested in pursuing an acquisition of the Company.

48.     On June 27, 2017, defendant Wygod met with KKR "to discuss its level of interest in an acquisition of the Company and the overall timing of the process."  This was despite, as provided above, defendant Wygod's prior indication that he did not intend to participate with any potential purchasers in connection with the possible sale of the Company.

49.     On July 18, 2017, defendant Wygod again met with KKR and Parent.  During that meeting, Wygod indicated that he would be willing to assist in any transition of the Company.

50.     On July 20, 2017, another bidder, Strategic Party B indicated to J.P. Morgan it was no longer interested in an acquisition of the Company.

51.     On that same day, the three remaining bidders each submitted the following proposals: (i) Parent and KKR submitted a proposal to acquire the Company for $62.35 per share; (ii) Strategic Party A submitted a proposal to acquire the Company for $62.00 per share; and (iii) Sponsor A submitted a proposal to acquire the Company for $62.00 per share. Following discussion, the Board directed J.P. Morgan to request that each bidder submit their best and final offers by 6:00pm on July 22, 2017.

52.     On the evening of July 22, 2017, the Board received the following proposals: (i) Parent and KKR submitted a proposal to acquire the Company for $66.50 per share; (ii) Strategic Party A verbally submitted a proposal to acquire the Company for $64.11 per share; and (iii) Sponsor A submitted a proposal to acquire the Company for $63.62 per share.

53.     Later that evening, the Board met to review preliminary results for the quarter ended June 30, 2017. Defendant Zatz then recused himself, and he and DeSimone were not present for the remainder of the meeting. The Board discussed the three final proposals it received and determined to negotiate final definitive documentation with Parent and KKR.

54.     The next morning, the Board resumed its meeting and J.P. Morgan rendered its fairness opinion. Following discussion, the Board approved the Merger Agreement without defendant Zatz's participation.

55.     Prior to the opening of U.S. stock markets on July 24, 2017, Parent, Purchaser and the Company executed the Merger Agreement.

**The Proposed Transaction**

56.     On July 24, 2017, WebMD and KKR issued a joint press release announcing the Proposed Transaction. The press release stated, in part:

> NEW YORK, NY – July 24, 2017 – WebMD Health Corp. (NASDAQ: WBMD), the leading source of health information, and Internet Brands, a KKR portfolio company, today announced that Internet Brands has entered into a definitive agreement to acquire WebMD in a transaction valued at approximately $2.8 billion.
>
> Under the terms of the agreement, a subsidiary of Internet Brands will commence a tender offer in the next 10 business days to acquire all of the issued and outstanding shares of WebMD common stock for $66.50 per share to be paid in cash upon completion of the transaction. This valuation represents a premium of approximately 30 percent to WebMD's share price on February 15, 2017, the day before WebMD announced that it was commencing a process to explore and evaluate potential strategic alternatives, as well as a premium of approximately 20 percent over WebMD's closing share price on July 21, 2017. The financing for the transaction is fully committed. The WebMD Board of Directors approved the merger agreement. The acquisition is expected to close during the fourth quarter of 2017, subject to the satisfaction of customary closing conditions.

* * *

"WebMD and Medscape are the market leaders in online health with unparalleled reach to consumers and healthcare professionals," said Bob Brisco, CEO of Internet Brands. "Since its founding, WebMD has established itself as a trusted resource for health information. We look forward to delivering that resource to even more users, by leveraging our combined resources and presence in online healthcare to catalyze WebMD's future growth."

"KKR and Internet Brands are pleased to be investing behind the experienced WebMD management team and trusted WebMD platforms. The combined portfolio of leading vertical internet assets will be a powerful one," said Herald Chen, Chairman of Internet Brands, KKR Member and Head of the Technology industry team. "We look forward to supporting and accelerating the growth and global expansion of the businesses."

**Insiders' Interests in the Proposed Transaction**

57.     WebMD and KKR insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of WebMD.

58.     Notably, it appears that certain members of Company management have secured positions for themselves following completion of the Proposed Transaction. According to the Recommendation Statement, "[p]ursuant to the Merger Agreement, the officers of WebMD immediately prior to the Effective Time will be the initial officers of the Surviving Company until their respective successors are duly elected or appointed and qualified or until the earlier of their death, resignation or removal in accordance with the certificate of incorporation and by-laws of the Surviving Company." Recommendation Statement at 10.

59.     Further, Company insiders stand to reap a substantial financial windfall for securing the deal with KKR. Pursuant to the Merger Agreement, all unvested equity-based awards held by Company executives will be converted into the right to receive cash payments.

The following tables set forth the cash payments WebMD's executive officers stand to receive in connection with their vested and unvested equity awards:

| Name | Total Number of Outstanding Company Stock Options[1] | Total Consideration for Outstanding Company Stock Options ($)[2] |
|---|---|---|
| **Non-Employee Directors:** | | |
| Mark J. Adler, M.D. | 62,700 | 1,692,240 |
| Ian G. Banwell | 13,200 | 204,732 |
| Neil F. Dimick | 114,488 | 3,333,745 |
| James V. Manning | 79,200 | 2,246,508 |
| William J. Marino | 52,800 | 1,115,664 |
| Joseph E. Smith. | 82,500 | 2,099,856 |
| Stanley S. Trotman, Jr. | 85,800 | 2,271,984 |
| Kristiina Vuori, M.D.. | 52,800 | 1,025,508 |
| **Executive Officers:** | | |
| Blake DeSimone. | 135,000 | 2,622,100 |
| Michael B. Glick | 217,500 | 4,892,675 |
| Rick Treese | 95,000 | 2,759,350 |
| Douglas W. Wamsley. | 207,500 | 4,848,625 |
| Martin J. Wygod | 133,334 | 2,678,352 |
| Steven L. Zatz, M.D. | 645,000 | 18,810,800 |

(1)   In connection with the Transactions, each Company Stock Option held by a non-employee director will fully accelerate as of the Effective Time. For the treatment of Company Stock Options held by the Company's executive officers under their employment or award agreements, please see the descriptions below under the heading "Employment Arrangements with Executive Officers" and "Item 8. Additional Information—Golden Parachute Compensation."

(2)   The amounts in this column represent the total consideration payable in respect of the outstanding Company Stock Options, whether vested or unvested, held by each non-employee director and executive officer of the Company, including any consideration in respect to unvested in-the-money Company Stock Options, that would become payable in installments on the same schedule as the vesting schedule contained in such converted Company Stock Option award or other applicable agreement, subject to continued service or employment, and remain subject to the other terms and conditions contained in the converted Company Stock Option award or other applicable agreement.

| Name | Total Number of Outstanding Restricted Shares[1] | Consideration for Outstanding Restricted Shares ($)[2] | Total Number of Outstanding Performance Shares[3] | Total Consideration for Outstanding Performance Shares ($)[4] |
|---|---|---|---|---|
| **Executive Officers:** | | | | |
| Blake DeSimone. | 23,500 | 1,562,750 | — | — |
| Michael B. Glick | 28,000 | 1,862,000 | — | — |
| Rick Treese | 9,584 | 637,336 | — | — |
| Douglas W. Wamsley. | 28,000 | 1,862,000 | — | — |
| Martin J. Wygod | 71,667 | 4,765,856 | 25,000 | 1,662,500 |
| Steven L. Zatz, M.D. | 62,500 | 4,156,250 | 30,000 | 1,995,000 |

(1)   For the treatment of Restricted Shares under the executive officers' employment or award agreements, please see the descriptions below under the heading "Employment Arrangements with Executive Officers" and "Item 8. Additional Information—Golden Parachute Compensation."

(2)   The amounts in this column represent the total consideration payable in respect of the outstanding Restricted Shares held by each executive officer, including any consideration that would become payable in installments on the same schedule as the vesting schedule contained in such converted Restricted Share award or other applicable agreement, subject to continued service or employment, and remain subject to the other terms and conditions contained in the converted Restricted Share award or other applicable agreement.

(3)   Pursuant to Mr. Wygod's employment and Performance Share award agreement, his Performance Shares will fully vest upon the consummation of the Transactions. For the treatment of Dr. Zatz's Performance Shares in connection with the consummation of the Transactions, please see "Item 8. Additional Information—Golden Parachute Compensation."

(4)   The amounts in this column represent the total consideration payable in respect of the outstanding Performance Shares held by Dr. Zatz and Mr. Wygod (including, with respect to Dr. Zatz, any consideration that would become payable on the same schedule as the vesting schedule contained in his converted Performance Share award or other applicable agreement).

60.     Moreover, if they are terminated in connection with the merger, WebMD's named executive officers will receive substantial severance benefits, including cash payments, in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash[1] ($) | Equity[2] ($) | Perquisites / Benefits[3] ($) | Tax Reimbursement[4] ($) | Total ($) |
|---|---|---|---|---|---|
| Blake DeSimone[5] | 680,000 | 3,573,800 | — | — | 4,253,800 |
| Michael B. Glick[5] | 637,500 | 4,370,338 | 1,000 | — | 5,008,838 |
| Douglas W. Wamsley[5] | 637,500 | 4,370,338 | 26,000 | — | 5,033,838 |
| Martin J. Wygod[6] | 5,725,000 | 8,642,532 | 57,000 | 0 | 14,424,532 |
| Steven L. Zatz, M.D.[7] | 1,437,500 | 12,199,150 | 26,000 | — | 13,662,650 |

(1)   As described and quantified below, this column represents the cash severance payments payable under each of the Named Executive Officer's employment agreement. The salary portion of the cash severance payments will be paid over the 12-month period following a termination of employment (except with respect to Mr. Wygod's payments, which are discussed below) and all other payments will be paid in a lump sum. Except with respect to Mr. Wygod, the cash severance payments are double-trigger benefits in that they will only be paid if the Named Executive Officers experience a qualifying termination of employment following a change in control. For each Named Executive Officer, other than Mr. Wygod, such payments would consist of: (i) one-times the Named Executive Officer's annual base salary and (ii) the bonus that the named executive officers would have received for the year their employment terminates if the date of termination is on or after July 1 of such year (or with respect to Mr. DeSimone, December 31), but before bonuses for that year are paid (for Dr. Zatz and Mr. DeSimone, the severance amounts would also become due if they resigned, for any reason, after one year following a change in control). For Mr. Wygod, such payments would become payable upon a termination of employment for any reason, regardless of a change in control, and would consist of: (i) an annual severance payment of $975,000, per year payable for three years following the date of termination in equal installments at the same time as WebMD's payroll practices (for an aggregate of $2,925,000) and (ii) his bonus for the year of termination and each of the two subsequent years (at $933,333.34) payable at the time bonuses are generally paid to other senior executives for the applicable year (for an aggregate of $2.8 million). In addition, all cash severance amounts payable to Mr. Wygod in connection with his termination of employment on or following a change in control are required to be placed in a rabbi trust.

## MATERIAL MISSTATEMENTS OR OMISSIONS

### The Recommendation Statement

61.     The Recommendation Statement filed with the SEC and disseminated it to WebMD's stockholders was materially incomplete and misleading. As a result, Company's stockholders to cannot make an informed decision whether to tender their shares in connection with the Offer or seek appraisal.

62.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (a) WebMD management's projections, including the projections utilized by the Company's financial advisor, J.P. Morgan, in its financial analyses; (b) J.P. Morgan's potential conflicts of interest;  (c) the valuation analyses prepared by J.P. Morgan in connection with the rendering of its fairness opinion; (d) the background process leading up to

the Proposed Transaction; and (e) WebMD insiders' potential conflicts of interest. Accordingly, WebMD stockholders are being asked to make a decision whether to tender their shares in connection with the Offer or seek appraisal without all material information at their disposal.

**WebMD's Financial Projections**

63.     The Recommendation Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

64.     The Recommendation Statement fails to disclose material information relating to the Company's projections provided by WebMD's management and relied upon by J.P. Morgan for its analyses.

65.     For example, the Recommendation Statement sets forth:

> J.P. Morgan calculated the present value of unlevered free cash flows that WebMD is expected to generate: (i) during the remainder of 2017 (applying a valuation date as of June 30, 2017) by calculating unlevered free cash flows for the remainder of 2017 by subtracting actual unlevered free cash flows as of the first half of 2017 from the applicable 2017E unlevered free cash flow based upon Management Forecasts, (ii) for calendar years 2018 through 2021 based upon Management Forecasts and (iii) for calendar years 2022 through 2026 based upon extrapolations of the Management Forecasts that were prepared by J.P. Morgan with the consent of WebMD and which were used by J.P. Morgan in connection with its financial analyses and in rendering its fairness opinion. J.P. Morgan also calculated a range of terminal values for WebMD at December 31, 2026 by applying perpetual growth rates ranging from 2.0% to 3.0% for unlevered free cash flow of WebMD during the terminal period of the projections. . . .

Recommendation Statement at 28. The Recommendation Statement fails to disclose the Company's unlevered free cash flows for calendar years 2022 through 2026, and the line items used to calculate unlevered free cash flows.

66.     The Recommendation Statement also discloses projections for various non-generally accepted accounting principles ("GAAP") metrics including adjusted earnings before

interest, tax, depreciation and amortization ("Adjusted EBITDA") and Unlevered Free Cash Flow for calendar years 2017 through 2021, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP for calendar years 2018 through 2021. The omission of the aforementioned line item projections renders the non-GAAP projections included in the Recommendation Statement materially misleading and incomplete.

67.     The importance of reconciling between GAAP and non-GAAP financial measures has long been widely acknowledged. The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information. Regulation G prohibits the use of non-GAAP financial measures outside of SEC filings unless they are accompanied by the most directly comparable GAAP accounting measure, as well as a reconciliation of the two. Such reconciliations were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.

68.     The omission of this information renders the statements in the "Financial Analyses and Opinion," "Company Management Forecasts" and "Explanation of Non-GAAP Financial Measures and Reconciliations to GAAP Financial Measures" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

**J.P. Morgan's Financial Analyses**

69.     The Recommendation Statement describes J.P. Morgan's fairness opinion and the various valuation analyses performed in support of its opinion. However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, WebMD's public stockholders are

unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to tender their shares in connection with the Offer or seek appraisal. This omitted information, if disclosed, would significantly alter the total mix of information available to WebMD's stockholders.

70.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) as mentioned above, the calendar year 2022 through 2026 unlevered free cash flows utilized by J.P. Morgan in this analysis and the line items used to calculate unlevered free cash flows; (ii) the inputs and assumptions underlying the discount rate range of 8.0% to 10.0%; (iii) J.P. Morgan's basis for using an assumed perpetuity growth rate range of 2.0% to 3.0% in calculating a range of terminal values for WebMD; (iv) the implied terminal value multiples resulting from the analysis; and (v) the value of additional tax savings from the usage of net operating losses and research and development credit carry forwards of WebMD for the projected period used by J.P. Morgan in the analysis.

71.     With respect to J.P. Morgan's *Public Trading Multiples* analysis, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the companies observed by J.P. Morgan in the analysis. A fair summary of such an analysis requires the disclosure of the individual multiples for each company utilized or, at a minimum, the high, low, mean and median multiples. Merely providing the range that a banker applied is insufficient, as stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company.

72.     With respect to J.P. Morgan's *Selected Transaction Analysis*, the Recommendation Statement similarly fails to disclose the individual multiples and financial metrics for the transactions observed by J.P. Morgan in the analysis.

73.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

74.     The omission of this information renders the statements in the "Financial Analyses and Opinion" and "Company Management Forecasts" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

**J.P. Morgan's Potential Conflicts of Interest**

75.     The Recommendation Statement provides:

> In addition, during the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates received approximately $87.9 million of aggregate fees from affiliates of Parent (including KKR and its portfolio companies) for corporate finance, treasury and asset management services. Such services during such period have included acting as joint lead arranger on a credit facility of an affiliate of Parent in April 2016. During the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates have had commercial or investment banking relationships with affiliates of Parent and with portfolio companies of KKR that are unrelated to the Offer and Merger, for which J.P. Morgan and such affiliates have received customary compensation. Such services during such period have included debt syndication, equity and debt underwriting and financial advisory services for such portfolio companies. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of affiliates of Parent and

such portfolio companies, for which it receives customary compensation or other financial benefits.

The Recommendation Statement does not disclose that during the two years preceding the date of J.P. Morgan's opinion: (i) the amount of "customary compensation" J.P. Morgan and its affiliates received in connection with its commercial or investment banking relationships with affiliates of Parent and with portfolio companies of KKR; and (ii) the "customary compensation or other financial benefits" J.P. Morgan received in connection with its commercial banking affiliate acting as an agent bank and a lender under outstanding credit facilities of affiliates of Parent and such portfolio companies. *Id.*

76.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

77.     The omission of this information renders the statements in the "Background of the Merger; Reasons for Recommendation" and "Financial Analyses and Opinion" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

**The Proposed Transaction's Background Process**

78.     The Recommendation Statement omits material information relating to the sale process leading up to the Proposed Transaction.

79.     Critically, the Recommendation Statement fails to expressly indicate whether the confidentiality agreements WebMD entered into with 38 parties, excluding KKR are still in effect and/or contain DADW standstill provisions that are presently precluding each and every of these 38 parties from making a topping bid for the Company.

80.     The disclosure of the terms of the standstill provisions is crucial to WebMD stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

81.     The omission of this information is particularly harmful to WebMD stockholders as the Company received competitive indications of interest from a variety of parties, who would now be foreclosed from making a topping bid, including: (i) Sponsor F which had participated in the first round of the process, and proposed a revised preliminary, non-binding indication of interest to acquire the Company at $61.00 per share, on June 12, 2017, but was not to invited by the Board into the second round of the process; and (ii) Strategic Party B who submitted a preliminary non-binding indication of interest for the acquisition of the Company at a per share price of $65.00 on June 9, 2017.

82.     Notably, the confidentiality and non-disclosure agreement entered into on April 6, 2017, between WebMD and KKR contains a DADW standstill provision with a term of eighteen months making it highly likely that the non-disclosure agreements entered into with the 38 parties during the sale process also contain DADW standstill provisions.

83.     In addition, the Recommendation Statement fails to provide WebMD's stockholders with material information necessary to evaluate whether the Board's decision to exclude Sponsor F from the sales process, who proposed a purchase of WebMD at $61.00 per share was reasonable. Namely, the Recommendation Statement sets forth that "[t]he Board decided not to invite Sponsor F into the second round of the process based on its level of interest relative to other bidders[,]" (Recommendation Statement at 16) but fails to disclose the per share prices included in the proposals from each of KKR, Sponsor A, Sponsor B, Strategic Party A, Sponsor D and Sponsor E, the parties who were invited into the second round of the process.

84. The omission of this information renders the statements in the "Background of the Merger" section of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

**Insiders' Potential Conflicts of Interest**

85. The Recommendation Statement also materially misleads stockholders as to the potential conflicts of interest faced by WebMD management and the Board. The Recommendation Statement sets forth that "[p]ursuant to the Merger Agreement, the officers of WebMD immediately prior to the Effective Time will be the initial officers of the Surviving Company until their respective successors are duly elected or appointed and qualified or until the earlier of their death, resignation or removal in accordance with the certificate of incorporation and by-laws of the Surviving Company." Recommendation Statement at 10. Additionally, the Company's July 24, 2017 press release quoted Herald Chen, Chairman of Internet Brands, KKR Member and Head of the Technology industry team, who stated "KKR and Internet Brands are pleased to be investing behind the experienced WebMD management team and trusted WebMD platforms." Yet, the Recommendation Statement fails to set forth any of the employment related discussions and negotiations that occurred between KKR and WebMD executive officers, including who participated in all such communications, when they occurred, and their content. The Recommendation Statement further fails to disclose whether any of KKR's prior proposals or indications of interest mentioned management retention.

86. Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations

that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

87.     Moreover, the Recommendation Statement sets forth that at the February 8, 2017 Board meeting defendant Wygod indicated that if the Board proceeded with a process to review strategic alternatives, including a possible sale of the Company, he did not intend to participate with any potential purchasers in connection with the possible sale of the Company. Recommendation Statement at 13. However, defendant Wygod proceeded to meet with potential purchasers during the sale process, including with (i) Co-Bidder A on June 2, 2017 (Recommendation Statement at 16); (ii) KKR on June 27, 2017 and July 18, 2017. Recommendation Statement at 17, 18.

88.     The Recommendation Statement fails to disclose what necessitated defendant Wygod's initial decision to not participate with any potential purchasers and why defendant Wygod disregarded his decision.

89.     Furthermore, at the July 23, 2017 Board meeting to "(i) determine[] that the Merger Agreement and the Transactions are fair to and in the best interests of the Company and its stockholders, (ii) declare[] it advisable to enter into the Merger Agreement, (iii) approve[] the execution, delivery and performance by the Company of the Merger Agreement and the consummation of the Transactions, (iv) resolve[] that the Merger shall be effected under Section 251(h) of the DGCL and (v) resolve[] to recommend that holders of Shares accept the Offer and tender their Shares to Purchaser pursuant to the Offer", defendant Zatz recused himself from voting on the matter. The Recommendation Statement is silent, however, as to the reasons why defendant Zatz recused himself from voting on the matter and if his recusal was linked to his procuring a unique benefit for himself.

90.     Such information is material to WebMD stockholders before their critical decision on the Proposed Transaction to (i) assess the Board's decision to enter into the Merger Agreement with KKR; (ii) assess whether the decision to enter into the Merger Agreement was clouded by conflicts of interest; and (iii) be fully informed whether the Board has erected measures to preclude the possibility of a topping bid by interested parties.

91.     Defendants' failure to provide WebMD stockholders with the foregoing material information renders the statements in the "Employment Arrangements with Executive Officers" and "Background of the Merger; Reasons for Recommendation" sections of the Recommendation Statement false and/or materially misleading and constitutes a violation of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act, and SEC Rule 14d-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement. Absent disclosure of the foregoing material information prior to the expiration of the Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction or seek appraisal and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

92.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class defined above.

93.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds or thousands of members in the proposed Class.  As of August 4, 2017, there were 37,303,875 shares of Company common stock issued and outstanding.

94.    Record owners and other members of the Class may be identified from records maintained by WebMD and/or its transfer agent(s) and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

97.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether Defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

b.    Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

c.    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

d.    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

98.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action

**CAUSES OF ACTION**

**COUNT I**
**AGAINST ALL DEFENDANTS**
**FOR VIOLATIONS OF SECTION 14(d) and SEC RULE 14d-9**

99.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

100.    Defendants have caused the Recommendation Statement to be issued with the intention of soliciting WebMD stockholders to tender their shares in the Offer.

101.    Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

102.    The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omission renders the Recommendation Statement false and/or misleading.

103.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation

Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

104.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision whether to tender their shares or seek appraisal if such misrepresentations and omissions are not corrected prior to the expiration of the Offer. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
## AGAINST ALL DEFENDANTS
## FOR VIOLATIONS OF SECTION 14(e)

105.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106.    Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the Offer.

107.    Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender his shares or seek appraisal pursuant to the Offer.

108.    As a direct and proximate result of these Defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court,

Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender his shares or seek appraisal.

## COUNT III
### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR VIOLATIONS OF SECTION 20(a)

109.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

110.    The Individual Defendants acted as controlling persons of WebMD within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of WebMD and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

111.    The Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Recommendation Statement at issue

contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

113.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

114.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

(c)    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

(d)    Awarding compensatory, including appraisal damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(e)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(f)     Awarding such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 14, 2017

STULL, STULL & BRODY

 /s/ Michael J. Klein
Aaron L. Brody
Michael Klein
6 East 45th Street
New York, NY 10017
Phone: (212) 687-7230
Fax: (212) 490-2022
abrody@ssbny.com
mklein@ssbny.com

*Attorneys for Plaintiff*